# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1683V
UNPUBLISHED

| | |
|---|---|
| HANNA REYNOLDS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: April 28, 2023<br><br>Special Processing Unit (SPU);<br>Ruling on the Record; Ruling on<br>Entitlement; Table Injury; Findings of<br>Fact; Onset; Influenza (Flu) Vaccine;<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA) |

*Jeffrey S. Pop, Jeffrey S. Pop & Associates, Beverly Hills, CA,* for Petitioner.

*Sarah Black Rifkin, U.S. Department of Justice, Washington, DC,* for Respondent.

## RULING ON ENTITLEMENT[1]

On October 30, 2019, Hanna Reynolds filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October 28, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, I find the onset of Petitioner's SIRVA occurred within the time set forth in the Table for a SIRVA, and that Petitioner is otherwise entitled to compensation.

## I. Relevant Procedural History

The case was activated on November 13, 2019 (ECF No. 7). On February 2, 2021, Respondent indicated that he was willing to engage in settlement discussions (ECF No. 19), and the parties engaged in negotiations. However, on August 24, 2021, Petitioner reported that they had reached an impasse (ECF No. 28). Respondent filed an amended Rule 4(c) Report on October 18, 2021 (ECF No. 31), and the parties again attempted negotiations, without success (ECF No. 33).

On January 5, 2022, Petitioner filed a motion for a ruling on the record (ECF No. 36). Respondent responded on February 3, 2022 (ECF No. 37), and Petitioner replied on February 9, 2022 (ECF NO. 38). The issue of Petitioner's entitlement to compensation is now ripe for resolution.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding the claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

---

[3] In summary, a petitioner must establish receipt of a vaccine covered by the Program, administered either in the United States and its territories, or in another geographical area but qualifying for a limited exception; that residual effects of the injury continued for more than six months (or meet the severity requirement in other ways not applicable in this case); and no civil suit has been filed and no award or settlement has been collected for the injury. *See* Section 11(c)(1)(A)(B)(D)(E).

3

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Relevant Factual History

The only factual issue disputed by the parties is whether Petitioner's left shoulder pain began within 48 hours of vaccine administration.

#### 1. Medical Records

On October 28, 2018,[4] Petitioner received a flu vaccine intramuscularly in her left arm at a Publix Pharmacy. Ex. 2 at 1.

Two months later, on December 27, 2018, Petitioner reported to Dr. Marc Hammerman of the Broward Institute of Orthopaedic Specialties, LLC. Ex. 3 at 8. This record documented that Petitioner had reported left shoulder pain "since she had a flu

---

[4] While the record indicates that the flu vaccine was given on October 28, 2018, Petitioner erroneously dated the form 10/27/18. Ex. 2 at 1.

4

shot on 5/30/18."[5] *Id.* Dr. Hammerman assessed Petitioner with pain of the left shoulder joint on movement, adding, "[r]otator cuff tendinitis but with the patient having the pain correlating to the time when she had her flu injection in the area of the proximal deltoid." *Id.* at 9. A form completed the same day indicated that Petitioner sought care for "pain after flu shot." *Id.* at 12. A questionnaire completed on the same date has a "Date of Injury," of either 5/30/2018 or 9/30/2018.[6] *Id.* at 14. Underneath that date in what appears to be a different person's handwriting are the words "since flu shot." *Id.*

On January 28, 2019, Petitioner returned to Dr. Hammerman to follow up concerning "LEFT shoulder complaints and upper extremity complaints after having the flu injection." Ex. 3 at 6. Dr. Hammerman again assessed Petitioner with left shoulder pain "correlating to the time when she had her flu injection in the area of the proximal deltoid." *Id.*

On February 18, 2019, Petitioner underwent a left shoulder MRI. The clinical indication for the MRI states, "[e]valuate left shoulder pain. Evaluate rotator cuff tendinitis. Pain and decreased range of motion for five months" (which would place onset in September 2018). Ex. 4 at 1. On the intake form, Petitioner stated she sought care for her shoulder injury due to "left shoulder and upper arm pain after a flu shot." *Id.* at 7. In response to a question about what caused her problem, she answered "flu shot." *Id.* Finally, the form inquired when her symptoms began, and Petitioner responded, "when I received a flu shot in Sep 2018."[7] *Id.*

Petitioner underwent a physical therapy evaluation on March 5, 2019. Ex. 5 at 5. The record includes an injury date of 11/14/2018 and indicates that the injury occurred four months earlier when Petitioner "had a flu shot and it aggravated her shoulder. pain never went away." *Id.* Petitioner saw Dr. Hammerman for additional follow up visits on February 25, April 18, and June 24, 2019. Ex. 3 at 1-4; Ex. 6 at 1-2.

After another treatment gap, Petitioner established care with Dr. Nancy Pyram-Bernard in August 2019, and underwent an annual physical examination. Ex. 14 at 9. She now reported a history of left shoulder pain for 11 months (which would put onset in September 2018). *Id.* Petitioner also reported that "last year she received a flu shot from publix where they hit a ligament in her left shoulder, that caused pain. she continued to

---

[5] There is no record of a flu shot on May 30, 2018, and neither party has asserted that she received a flu shot on that date.

[6] Dr. Hammerman's office appears to have interpreted this as 5/30/2018. Ex. 3 at 8.

[7] There is no record indicating that Petitioner received a flu shot in September 2018, and neither party has asserted that she did.

5

have pain for 2 months after the injection and went to an orthopedic surgeon who noted that she had a 50% tear in her ligament." *Id*. Petitioner was scheduled for surgery in October 2019. *Id*.

On September 25, 2019, Petitioner was seen by Dr. Pyram-Bernard for a pre-operative appointment. Ex. 14 at 14. She was cleared for surgery. *Id*. at 15.

On October 16, 2019, Petitioner underwent left shoulder surgery. Ex. 9 at 14. She was seen for post operative orthopedic appointments on October 17, October 21, November 11, and November 25, 2019. Ex. 9 at 5-10; Ex. 10 at 34-37.

Petitioner reported for a physical therapy evaluation on November 26, 2019. Ex. 11 at 2. The record now notes (for the first time in the records overall) an injury date of October 30, 2018 and states, "[p]atient reports that she got a flu shot in 10/18 which resulted in pain in the left shoulder. Patient went to doctor following the flu shot and tried anti-inflammatory medication with no results." *Id*. This treatment visit occurred after the case's initiation.

Petitioner was seen by Dr. Hammerman on December 26, 2019 and January 27 and February 17, 2020. Ex. 10 at 26-33. She returned to Dr. Hammerman nearly a year later, on February 4, 2021. Ex. 18 at 17-18. At the February 4, 2021 appointment, she reported some pain. *Id*. Dr. Hammerman noted that she had been swimming and that it "may be an overuse syndrome." *Id*. She was also experiencing some problems with her right arm. *Id*. On examination, her left shoulder range of motion was described as "quite satisfactory," with 170 degrees of abduction and forward flexion. *Id*. She was assessed with tendinitis of the left rotator cuff and advised to modify activities. *Id*.

## 2. Declarations

Petitioner submitted four declarations in support of her claim, two on her own behalf, one from her daughter, and one from a colleague.

Petitioner averred that when she received the flu shot on October 28, 2018, she felt immediate pain that "was so intense that I remember screaming out loud." Ex. 1 at ¶ 6. Petitioner explained that she took ibuprofen to help with the pain. *Id*. She did not immediately seek medical care because she "kept thinking that my pain would go away on its own." *Id*. at ¶ 7. With respect to the December 27, 2018 record of her appointment with Dr. Hammerman, she explained that she "filled out a questionnaire explaining that the onset of my pain was after I got the flu shot. I accidentally mixed up the date that I got the flu shot on the questionnaire but am certain that my pain started from the shot." *Id*. at ¶ 9.

6

In her supplemental declaration, Petitioner explained that she "yelled out loud from the pain" as the shot was administered. Ex. 19 at ¶ 3. When she got home, she told her daughter about the pain. *Id.* at ¶ 4. She explained that she does not like to take pain medication, but took ibuprofen for pain that night. *Id.* Before this injury, she was "healthy and rarely saw doctors," and put off going to a doctor because she expected the pain to resolve on its own. *Id.* at ¶ 6. However, rather than improving, her shoulder pain worsened. *Id.* at ¶ 7. The pain interfered with daily chores like lifting things or driving. *Id.* She asked her daughter and husband for help when cooking for Thanksgiving. *Id.*

Petitioner states that her insurance company's nurse line advised her to see an orthopedist. Ex. 19 at ¶ 9. She called four orthopedist offices before scheduling an appointment with Dr. Hammerman. *Id.* at ¶ 10.

Petitioner's daughter, Alicia Reynolds, averred that one afternoon in October 2018 Petitioner came home complaining about a flu shot she had just received at a Publix pharmacy. Ex. 16. Petitioner's daughter explained that Petitioner told her that "she screamed while she was getting the shot because it felt like it was jabbed into her shoulder with a lot of force. Her left shoulder was still hurting her." *Id.* at ¶ 7. Petitioner's daughter explained that Petitioner's shoulder pain worsened over the following weeks and months, and that Petitioner had difficulty with activities such as driving, getting dressed, and carrying things. *Id.* at ¶¶ 10-14.

Jennifer Aleman, a co-worker of Petitioner's, stated that in October 2018, Petitioner told her that she was planning to get a flu shot at Publix due to a gift card promotion. Ex. 17 at ¶¶ 7-8. Ms. Aleman stated that she saw Petitioner the following workday after she received the flu shot, and Petitioner told her that her shoulder "really hurt" and she was worried that it was caused by the flu shot. *Id.* at ¶ 9.

### C. The Parties' Arguments

Petitioner asserts that the record supports a finding that her pain began immediately after receiving the flu vaccine. Petitioner's Motion for Ruling on Entitlement ("Mot.") at 8. She relies on the December 27, 2018 appointment with Dr. Hammerman reporting left shoulder pain since her flu shot and noting pain correlating to the time of the flu injection, in addition to other records noting shoulder pain after her flu shot and that her symptoms began after her flu shot. *Id.* at 9-10. Petitioner asserts:

> Whenever Petitioner complained about her left shoulder pain she consistently linked it to stemming from her flu vaccination. Petitioner told all of her medical providers that the pain had been ongoing since the flu

7

vaccination. Petitioner explained that she had immediate pain from the vaccination that continued to worsen. Even though Petitioner occasionally misstated the actual date of vaccination, she was consistent in placing onset on the day she received her flu vaccination.

Mot. at 10.

Petitioner argues that in addition to her own declarations, declarations from two other witnesses support a finding that the onset of her shoulder pain was immediate. She asserts that declarations submitted by her daughter and colleague indicate that they recall her complaining of her left shoulder "within days if not hours after receiving her flu vaccination." Mot. at 11.

Petitioner argues that she meets the remaining SIRVA Table requirements as well. Mot. at 14-15. She asserts that she did not have a history of pain, inflammation, or dysfunction of her left shoulder prior to receiving the October 28, 2018 flu vaccine. *Id.* at 14. She argues that there is no evidence that her symptoms expanded beyond her left shoulder where the vaccine was administered, and she never exhibited any symptoms that would cause her providers to believe she was suffering from another condition or abnormality that would explain her symptoms. *Id.* at 15. Thus, Petitioner believes she is entitled to compensation.

Respondent argues that the record does not establish that Petitioner suffered the first symptom or manifestation of onset of her injury within 48 hours of vaccine administration, and thus she is not entitled to compensation. Respondent's Response in Opposition ("Opp.") at 1. Respondent asserts that Petitioner did not seek treatment for her left shoulder until two months after vaccination, which Respondent infers "suggests that petitioner did not experience immediate, severe post-vaccination shoulder pain." *Id.* at 2. Respondent further emphasizes that when Petitioner did seek care, she inconsistently reported the date of onset. *Id.*

Respondent further argues that although Petitioner's medical records relate onset to her flu vaccination, the records place onset at variable times: five months before vaccination, one month prior to vaccination, as well as two weeks after vaccination. Opp. at 3. And Respondent disputes Petitioner's claim that she was consistent in placing onset on the day of vaccination. *Id.* Instead, Respondent asserts that the records "merely document petitioner's own recollection that her pain began sometime after vaccination," thus not preponderantly showing a 48-hour onset. *Id.* Respondent further suggests that a notation stating that the vaccine had "aggravated" her shoulder could suggest a preexisting injury. *Id.* at n. 4 (*citing* Ex. 5 at 5).

Respondent asserts that Petitioner's witness declarations asserting that she suffered immediate pain are "difficult to square with her decisions to forego care" until two months after vaccination. Opp. at 4. Respondent discounts the declarations submitted from Petitioner's daughter and coworker because they were executed nearly two and a half years after vaccination and, in Respondent's view, are not corroborated by records. *Id.*

Petitioner replies that Respondent fails to look at the record as a whole. Petitioner's Reply ("Reply") at 1. Petitioner asserts that the inconsistencies in the records occurred because Petitioner provided an incorrect approximate date of vaccination. *Id.* Petitioner maintains that despite this error, she "always made it clear that her symptoms were caused by the vaccination." *Id.*

Petitioner asserts that the introductory questionnaire she filled out at her first appointment after vaccination was incorrectly transcribed, and that Petitioner reported the date of injury as 9/30/2018, but the transcriber misread the "9" as a "5." Reply at 3. Petitioner cites other handwritten "5s" in the record. *Id.* Petitioner adds that she "made a point to write 'since flu shot' after the date" on the record, but provided an approximate date of vaccination that incorrectly placed the date one month before vaccination. *Id.* Petitioner asserts that "it is clear she did not write that the onset of her injury was in May 2018." *Id.*

Petitioner relies on the Federal Circuit's recognition in *Kirby*, 997 F.3d at 1383, that medical records are not always accurate and complete. Reply at 1-2. Petitioner argues:

> By focusing on these inaccuracies in the medical record (that all most likely stemmed from Petitioner incorrectly approximating the date of her flu vaccination), Respondent ignores the totality of the medical records that clearly places onset within 48 hours of vaccination. Petitioner always linked her left shoulder injury from the flu vaccination to all of her medical providers.

Reply at 4.

### D. Factual Finding Regarding QAI Criteria for Table SIRVA

Respondent objects only to the second SIRVA QAI requirement, arguing that there is not preponderant evidence that the onset of Petitioner's alleged SIRVA occurred within 48 hours, the time set forth in the Table. The other SIRVA QAI criteria are uncontested.

9

### 1. Onset

As a threshold consideration, I note that Respondent's suggestion that a two month delay in seeking treatment undercuts a favorable onset determination is unpersuasive. Given the nature of SIRVA injuries, some delays in treatment are common in Program cases. *Winkle v. Sec'y of Health & Human Servs.*, No. 20-485V, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021) ("[i]t is common for a SIRVA petitioner to delay treatment, thinking his/her injury will resolve on its own" and finding that the onset of the petitioner's pain occurred within 48 hours of vaccination in spite of a five month delay in seeking treatment). And treatment gaps otherwise more commonly go to the *severity* of the injury, and thus impact damages. *See Miller v. Sec'y of Health & Human Servs.*, No. 20-604V, 2022 WL 3641716 (Fed. Cl. Spec. Mstr. July 22, 2022) (rejecting Respondent's argument that a petitioner could not establish onset due to a 71 day delay in seeking treatment, coupled with a record suggesting that her pain began slightly before the date of vaccination, in light of other evidence placing onset after vaccination). Whether Table onset is met requires consideration of *what* records support that issue – not (in most cases) when they were created.[8]

There are also issues about mistakes in the record regarding fundamental issues like the date of vaccination, which in turn impact the onset issue. A petitioner's errors or inconsistencies in reporting the onset of his or her symptoms are relevant evidence, but do not by themselves defeat a finding of onset within 48 hours. *See Miller*, 2022 WL 3641716, at *3 (finding onset despite record suggesting onset occurred prior to vaccination, where other records clarified that the onset of pain occurred after vaccination). At bottom, the fact that medical records do not reflect a precise date of onset does not undercut a finding of onset within 48 hours, based upon the totality of the evidence. *Welch v. Sec'y of Health & Human Servs.*, No. 18-660V, 2020 WL 7483129, at *6 (Fed Cl. Spec. Mstr. Nov. 18, 2020).

Respondent asserts that this case is distinguishable from *Welch* because in that case I indicated that there was "no counterevidence undercutting Petitioner's contention that her pain began close-in-time to vaccination," while in this case Respondent asserts there *is* such evidence undercutting Petitioner's claim, e.g., the medical records suggesting varying dates of onset. However, the Vaccine Act contemplates this precise situation, and allows me to find onset within the Table period despite having to weigh contrary evidence. Section 13(b)(2).

---

[8] Of course, the longer a claimant avoids treatment, the more attenuated the argument that SIRVA pain was immediate; a six month or one-year gap is facially more difficult to overcome. But a short gap does not operate as a *per se* rebuttal of onset.

I also reject Respondent's suggestion that a record indicating that the flu shot aggravated Petitioner's shoulder means that the vaccination aggravated a pre-existing injury. The mere use of the term "aggravated," with no other evidence of a pre-existing shoulder injury, is not convincing. Indeed, while one definition of aggravate is "to make worse, more serious, or more severe," another is "to produce inflammation in." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/aggravate (last visited Apr. 28, 2023).

The medical records in this case admittedly include a variety of different potential dates for the onset of Petitioner's shoulder pain: May 30, 2018,[9] September 2018,[10] October 30, 2018,[11] early November 2018,[12] and November 14, 2018.[13] This makes determining the onset of Petitioner's pain challenging. The onset question is further complicated by the fact that the medical records closest in time to Petitioner's vaccination and initial treatment support an onset date *prior* to vaccination. The first medical record in which Petitioner reported that she received the flu shot and her pain began in October 2018 was over a year after vaccination, in November 2019 (and because it was generated after the case's initiation, it is reasonably given less weight).

However, despite these contradictions, Petitioner was consistent in relating the pain to the receipt of her flu shot, and she repeatedly reported that her pain had continued *since* her flu shot. The medical records thus record that she had pain "since a flu shot,"[14] "pain correlating to the time when she had her flu injection in the area of her proximal deltoid,"[15] "pain after flu shot,"[16] pain "since flu shot,"[17] "LEFT shoulder complaints and

---

[9] Ex. 3 at 8 (December 27, 2018 appointment with orthopedist Dr. Hammerman indicating that Petitioner presented with "pain involving her LEFT shoulder since she had a flu shot on 5/30/18").

[10] Ex. 4 at 1, 7 (February 18, 2019 record indicating that pain and decreased range of motion had been present for five months); Ex. 14 at 9 (August 23, 2019 record of Dr. Pyram-Bernard documenting shoulder pain for 11 months).

[11] Ex. 11 at 2 .(November 26, 2019 physical therapy evaluation listing an injury date of October 30, 2018).

[12] Ex. 5 at 5 (March 5, 2019 physical therapy evaluation indicating that the injury occurred four months earlier).

[13] Ex. 5 at 5 (listing an injury date of 11/14/2018 at top of form).

[14] Ex. 3 at 8 (December 27, 2018 appointment with Dr. Hammerman documenting pain "since she had a flu shot").

[15] Ex. 3 at 9 (December 27, 2018 Dr. Hammerman record).

[16] Ex. 3 at 12 (December 27, 2018 Dr. Hammerman record).

[17] Ex. 3 at 14 (December 27, 2018 Dr. Hammerman record).

11

upper extremity complaints after having the flu injection,"[18] "left shoulder and upper arm pain after a flu shot . . . . [symptoms began] when I received a flu shot in Sep 2018,"[19] she "had a flu shot and it aggravated her shoulder,"[20] "last year she received a flu shot from publix where they hit a ligament in her left shoulder, that caused pain,"[21] "[p]atient reports that she got a flu shot in 10/18 which resulted in pain in the left shoulder."[22] Several of these records were the product, moreover, of treatment events from the fall of 2018.

Some records support an onset in May or September of 2018, which would predate vaccination entirely. But they too relate the onset of Petitioner's pain to a flu shot that she unquestionably had not received at those times. Thus, the overall record establishes that Petitioner consistently related her pain to her flu shot, but displayed a poor memory for dates, resulting in several inaccurate onset dates being reflected in her medical records.

I thus find that the medical records establish at least two fundamental points: Petitioner (1) received a flu vaccine on October 28, 2018, and (2) subsequently and repeatedly sought medical treatment for shoulder pain *since* her flu vaccination. "Since" is defined as "from a definite past time until now." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/since (last visited Apr. 28, 2023). Therefore, the medical records support a finding that Petitioner experienced shoulder pain from the date of her flu vaccine – October 28, 2018 – and continued at least until her December 27, 2018 appointment with Dr. Hammerman (Ex. 3 at 8-9).

Admittedly, the same records containing varying potential onset dates are troubling. Nonetheless, the Vaccine Act contemplates that records may not be accurate as to onset, and allow me to find, by a preponderance of the evidence, that the onset of an injury occurred within the time set forth in the Table even if it was incorrectly recorded as having occurred outside that timeframe. Section 13(b)(2). "The preponderance of evidence standard is often described as 50 percent plus a feather." *K.A. v. Sec'y of Health & Human Servs.*, 164 Fed. Cl. 98, 127 (2022) (*citing Torday v. Sec'y of Health & Human Servs.*, No. 07-372V, 2009 WL 5196163 (Fed. Cl. Spec. Mstr. Dec. 10, 2009)). This is a quintessential "close case," and it should be decided for Petitioner given the weight of evidence even if Respondent reasonably observed that (due to repeated mistakes about

---

[18] Ex. 3 at 6 (January 28, 2019 appointment with Dr Hammerman).

[19] Ex. 4 at 7 (February 2019 MRI patient questionnaire form).

[20] Ex. 5 at 5 (March 5, 2019 physical therapy evaluation).

[21] Ex. 14 at 9 (August 23, 2019 Dr. Pyram-Bernard record).

[22] Ex. 11 at 2 (November 26, 2019 physical therapy evaluation).

the date of vaccination) onset was misreported on several occasions (although *always* with respect to the flu shot occurring first).

My determination is strengthened by the declarations Petitioner submits. They are consistent with the conclusion that her shoulder pain began immediately following the administration of her flu vaccine on October 28, 2018. I do not rely solely on these declarations, but they are not rebutted by the medical evidence, and bulwark overall Petitioner's onset claim.

The fact that the delay in seeking treatment was only two months – which is not immediate, but not atypical in a SIRVA case[23] – and that Petitioner was consistent in relating her symptoms to her flu vaccine is, in my view, the tiniest feather, sufficient to tip the balance. I find that a preponderance of the evidence supports a finding that Petitioner's left shoulder pain began immediately following the administration of the flu vaccine on October 28, 2018.

### 2. Other SIRVA QAI Criteria

With respect to the remaining SIRVA QAI criteria, which are uncontested, the record contains sufficient evidence showing they are satisfied in this case. *See* 42 C.F.R. § 100.3(c)(10)(i) & (iii)-(iv). A thorough review of the record in this case does not reveal either a prior or other condition or abnormality that would explain Petitioner's symptoms, or pain or limited ROM other than in her left shoulder. Exs. 3, 7, 8, 14. Thus, all elements of a Table SIRVA claim have been preponderantly established.

### E.     Other Requirements for Entitlement

Because Petitioner has satisfied the requirements of a Table SIRVA, she need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of the injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence which fulfills these additional requirements. Exs. 1, 2, 6, 9.

---

[23] *See, e.g.*, *Miller*, 2022 WL 3641716, and *Winkle*, 2021 WL 2808993, discussed *infra*.

## Conclusion

Based on my review of the record as a whole, I find that it is more likely than not that the onset of Petitioner's shoulder pain occurred immediately upon vaccination. I find that all other SIRVA Table requirements are met, as are other requirements for entitlement. Therefore, Petitioner's motion for a ruling on the record that she is entitled to compensation is **GRANTED**.

**In view of the face ruling herein and the evidence of record, I find that Petitioner is entitled to compensation.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
