# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1683V

| | |
|---|---|
| HANNA REYNOLDS, | Chief Special Master Corcoran |
| Petitioner, | Filed: July 11, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Jeffrey S. Pop, Jeffrey S. Pop & Associates, Beverly Hills, CA,* for Petitioner.

*Sarah Black Rifkin, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On October 30, 2019, Hanna Reynolds filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October 28, 2018. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, I find that Petitioner is entitled to a damages award of **$110,000.00 for actual pain and suffering, plus $2,647.14 in actual unreimbursable expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

### I.   Relevant Procedural History

The case was activated on November 13, 2019 (ECF No. 7). On February 2, 2021, Respondent indicated that he was willing to engage in settlement discussions (ECF No. 19). The parties negotiated for six months, but reached an impasse (ECF No. 28). After Respondent filed his Rule 4(c) Report, which he later amended, the parties again attempted negotiations, without success (ECF Nos. 29-33).

After briefing, I ruled that Petitioner was entitled to compensation on April 28, 2023 (ECF No. 39). The parties then attempted to negotiate damages, but again reached an impasse (ECF Nos. 42-44). The parties have now briefed damages (ECF Nos. 45, 46, 48). The matter is ripe for resolution.

### II.   Relevant Medical History

On October 28, 2018,[3] Petitioner received a flu vaccine intramuscularly in her left arm at a Publix Pharmacy. Ex. 2 at 1.

Two months later, on December 27, 2018, Petitioner reported to Dr. Marc Hammerman of the Broward Institute of Orthopaedic Specialties, LLC for left shoulder pain after her flu vaccination. Ex. 3 at 8. She reported pain levels ranging from five to seven out of ten depending on activities. *Id.* Her pain limited her motion and interfered with her work activities as an accountant. *Id.* It also severely restricted her sports activities. *Id.* On examination, she had full passive range of motion ("ROM") but painful active ROM. Dr. Hammerman assessed Petitioner with pain of the left shoulder joint on movement and tendonitis of the left rotator cuff. *Id.* at 9.

On January 28, 2019, Petitioner returned to Dr. Hammerman. Ex. 3 at 6. Her left shoulder pain was slightly better, but she still experienced discomfort, especially at nighttime. *Id.* Her active ROM continued to be painful. *Id.* Dr. Hammerman prescribed a Medrol dosepak, instructing Petitioner to take Zantac as well for gastrointestinal side effects from Medrol. *Id.* If her pain continued, he planned to order an MRI. *Id.*

Three weeks later (February 18, 2019), Petitioner underwent a left shoulder MRI. Ex. 4 at 1. The MRI showed a moderate degree of rotator cuff tendinosis with low grade partial thickness tearing involving the supraspinatus tendon, mild infraspinatus and subscapularis tendinosis, moderate biceps tendinosis, mild subdeltoid bursitis,

---

[3] While the record indicates that the flu vaccine was given on October 28, 2018, Petitioner erroneously dated the form October 27th (instead of the 28th). Ex. 2 at 1.

degenerative changes with edema, mild labral blunting and fraying, and small joint effusion. *Id.* at 1-2.

Petitioner saw Dr. Hammerman to review the MRI on February 25, 2019. Ex. 3 at 3. She stated that in the morning her pain ranged from one to four out of ten, but as the day progressed her pain increased to six to eight out of ten. *Id.* Her pain was not affecting her work activities any longer. *Id.* On examination, she displayed "satisfactory" shoulder ROM, but "obvious pain" with abduction and internal rotation. *Id.* During the examination, her pain ranged from one to three out of ten. *Id.* Dr. Hammerman assessed her with a partial rotator cuff tear, and prescribed Mobic and physical therapy ("PT"). *Id.* at 4.

Petitioner underwent a PT evaluation on March 5, 2019. Ex. 5 at 5. She reported a current pain level of two out of ten, ranging to eight out of ten at worst. *Id.* On examination, her left shoulder active ROM was reduced compared to her right shoulder. *Id.* at 6. A treatment plan of three visits a week for four weeks was established. *Id.* at 7.

Petitioner returned to Dr. Hammerman on April 18, 2019. Ex. 3 at 1. She had seen improvement in strength after six weeks of PT, but was still in pain, especially with activity during the daytime. *Id.* Her left shoulder ROM was 170 degrees in abduction and forward flexion, with a pain level of five out of ten. *Id.* Dr. Hammerman recommended that she continue working on her home exercise program and return as needed. *Id.*

Petitioner attended a total of 12 PT sessions between March 5 and May 10, 2019. Ex. 5 at 5-45. By March 17th, her pain had decreased to three to six out of ten, and she had slight improvements in her left shoulder active ROM. *Id.* at 19-20. However, by April 5th, her pain had *worsened*, now ranging from five to eight out of ten, with no further improvements in ROM. *Id.* at 36. At her discharge on May 10th, her pain level remained between five and eight out of ten. *Id.* at 45.

Petitioner told Dr. Hammerman on June 24, 2019 that PT had helped with her strength and motion, but pain was impacting her quality of life and she was considering surgery. Ex. 6 at 1. She described her pain as three out of ten. *Id.* On examination, she had satisfactory ROM, but pain with abduction and internal rotation, and tenderness in the subacromial area. *Id.* Dr. Hammerman and Petitioner reviewed the risks and benefits of surgery, with Petitioner deciding to take time to contemplate her choices. *Id.* at 1-2.

Petitioner established care with Dr. Nancy Pyram-Bernard in August 2019, and underwent an annual physical examination. Ex. 14 at 9. Petitioner complained of left shoulder pain, explaining that she had been in constant pain for 11 months and that it was "very disruptive and bothersome." *Id.* The pain was aggravated by movement and relieved by rest. *Id.* She was scheduled for surgery in October 2019 and wanted to make

sure she was healthy. *Id.* Petitioner had pre-operative appointments with Dr. Pyram-Bernard and Dr. Hammerman in September and October 2019. Ex. 14 at 14; Ex. 9 at 11.

On October 16, 2019, Petitioner underwent left shoulder surgery. Ex. 9 at 14. Dr. Hammerman repaired superficial tearing of her supraspinatus tendon and performed a left shoulder arthroscopy with debridement of the labrum, acromioplasty, resection of the distal clavicle, and release of residual biceps tendon and biceps tenodesis. *Id.*

Petitioner saw Dr. Hammerman for a post operative evaluation the day after her surgery. Ex. 9 at 9. She had postoperative pain as expected, and was advised to continue working on passive ROM. *Id.* Four days later (October 21, 2019), Petitioner saw Dr. Hammerman's physician assistant Katherine Wintle, reporting difficulty tolerating exercises over the weekend, with significant pain. *Id.* at 7. Petitioner's incisions were healing well, and passive ROM was "performed relatively easily." *Id.* Petitioner saw Dr. Hammerman again on October 25, 2019. *Id.* at 5.

On November 11, 2019, Petitioner saw Dr. Hammerman for a follow up. Ex. 10 at 36. Petitioner had continued working on passive ROM and was doing well, but noted some increased pain over the past weekend. *Id.* Two weeks later (November 25, 2019), Dr. Hammerman noted that Petitioner was doing well and working on passive ROM. *Id.* at 34. He instructed her to start PT. *Id.* at 35.

Petitioner was seen for a PT evaluation on November 26, 2019, just over a month after her shoulder surgery. Ex. 11 at 2. Her pain levels ranged from two to six out of ten. *Id.* Her left shoulder passive ROM was 140 degrees in flexion, 95 degrees in abduction, and 50 degrees in external rotation. *Id.* at 3.

After a month of post-operative PT (December 26, 2019), Petitioner's pain had worsened somewhat, now ranging from four to seven out of ten. Ex. 11 at 38. She had slight improvements in her left shoulder passive ROM. *Id.* at 39. Her treater noted that she continued to lack functional mobility in her left upper extremity and continued to require formal PT. *Id.* at 52.

Petitioner saw Dr. Hammerman on December 26, 2019, reporting that she was doing well but had some increased discomfort as she increased her strengthening program. Ex. 10 at 32. Dr. Hammerman recommended that she continue PT, but decrease the strengthening component which he thought may be aggravating her. *Id.* By mid-January 2020, she again reported increased pain to her physical therapist, ranging from six to eight out of ten, and her passive ROM had worsened. Ex. 11 at 53, 58.

On January 27, 2020, Petitioner returned to Dr. Hammerman for persistent left elbow and forearm pain. Ex. 10 at 29. She was continuing PT for her shoulder, which was

4

gradually improving, although she still had pain at night. *Id.* However, she had returned to desk work approximately two weeks after her shoulder surgery with her arm in a sling, and typing with her elbow flexed. *Id.* She believed this is when she started experiencing left forearm pain, and it had since progressed to include paresthesias along the ulnar nerve distribution to her fourth and fifth digits. *Id.* On examination, she had full left elbow ROM, with a positive Tinel sign. *Id.* She had mild discomfort with pronation of the forearm against resistance. *Id.* Her left shoulder was still somewhat weak. *Id.* She was assessed with left cubital tunnel syndrome and given Mobic and Gabapentin. *Id.* at 30.

A few weeks later (February 17, 2020), Petitioner returned to Dr. Hammerman. Ex. 10 at 26. Her elbow and forearm were 60-70% better, and her shoulder had improved as well. *Id.* Dr. Hammerman determined that no further treatment was needed for her elbow, and advised her to continue working on strengthening and ROM exercises for her shoulder. *Id.*

Petitioner attended 26 PT sessions between November 26, 2019 and March 12, 2020, before stopping treatment due to the COVID-19 Pandemic. Ex. 11 at 2-80; Ex. 24 at 8-30. By March 2020, her pain levels had improved, ranging between zero to four out of ten. Ex. 24 at 16. Her ROM had improved, but she continued to have intermittent pain and decreased ROM and strength. *Id.* Her left shoulder active ROM was 140 degrees in flexion, 120 degrees in abduction, 50 degrees in external rotation, and 70 degrees in internal rotation. *Id.*

Petitioner returned to Dr. Hammerman nearly a year later, on February 4, 2021, reporting left shoulder pain and right cubital tunnel syndrome. Ex. 18 at 17. Dr. Hammerman noted that she had been swimming and that it "may be an overuse syndrome." *Id.* On examination, her left shoulder range of motion was "quite satisfactory," with 170 degrees of abduction and forward flexion, but she continued to have tenderness in the subacromial area. *Id.* She was assessed with tendinitis of the left rotator cuff and right cubital tunnel syndrome, and advised to avoid putting pressure directly over the ulnar aspect of the elbow and try Gabapentin. *Id.* For her left shoulder, Dr. Hammerman advised activity modification, such as cycling instead of swimming. *Id.* No further medical records have been filed.

### III.   Declarations

Petitioner submitted four declarations in support of her claim: two on her own behalf, one from her daughter, and one from a colleague. Exs. 1, 16, 17, 19.

Petitioner states that when she received the flu vaccine, she "felt instant pain that was more intense than pain from any other shot [she] had ever received," and she recalls screaming out loud from the pain. Ex. 1 at ¶ 6. She did not seek care right away because

she assumed that it was normal to have pain after vaccination, but the pain lingered. *Id.* at ¶ 7. Her shoulder pain made daily chores such as lifting things or driving painful. Ex. 19 at ¶ 7.

Prior to her shoulder injury, Petitioner was very active, doing cardio workouts with exercise videos at least three times a week to manage her diabetes. Ex. 19 at ¶ 13. For over ten years since being diagnosed with diabetes, she did not have any symptoms because she was so active. *Id.* However, following her shoulder injury she has not been able to exercise in the same manner, and started having diabetes symptoms that she needs to closely monitor. *Id.* She is afraid to do strength training such as planks out of fear it will aggravate her shoulder. *Id.*

Petitioner began working from home eight days after her shoulder surgery (before the COVID-19 Pandemic) because it is painful to drive long distances, and continues to work from home. Ex. 19 at ¶ 15. Before her surgery, she developed right elbow pain from the way she typed in order to protect her left arm. *Id.* at ¶ 16. She continues to have stiffness and occasional pain in her left shoulder. *Id.* at ¶ 17. She stopped going to PT and orthopedic appointments in March 2020 because of the COVID-19 Pandemic, opting to do at home exercises. *Id.* at ¶ 12.

Petitioner's daughter, Alicia Reynolds, submitted a declaration in support of Petitioner. Ex. 16. She lives at home and sees her mother daily. *Id.* at ¶ 6. She recalls her mother coming home the day she received the flu vaccine in October 2018 and stating that she "screamed while she was getting the shot because it felt like it was jabbed into her shoulder with a lot of force." *Id.* at ¶ 7. Petitioner's shoulder pain worsened and limited her driving. *Id.* at ¶¶ 10-12. She also noticed her mother having pain while getting dressed, and had to help her mother carry groceries due to pain. *Id.* at ¶¶13-14. Her mother complained daily of her shoulder pain. *Id.* at ¶ 15. During Christmas 2018, her mother could not lift the box of ornaments or help decorate the tree as she usually does. *Id.* at ¶ 16.

Petitioner's co-worker, Jennifer Aleman, submitted a declaration in support of Petitioner. Ex. 17. Petitioner told Ms. Aleman about her shoulder pain from the flu shot, and was in "constant pain" because of her shoulder. *Id.* at ¶¶ 9, 12-13. Petitioner was usually in pain when she arrived at work because it hurt to drive and she had a long commute. *Id.* at ¶ 13. Petitioner had difficulty getting things down from high cabinets due to shoulder pain. *Id.* at ¶ 14.

## IV.   The Parties' Arguments

Petitioner first sought treatment for her shoulder pain 60 days after vaccination, but had no intervening appointments during that time. Petitioner's Brief in Support of Damages, filed Sept. 25, 2023, at *8 (ECF No. 45) ("Br."). She did not seek care sooner

6

because she hoped the pain would subside on its own; when it did not, she began the process of finding an orthopedist for an evaluation. Br. at *8-9.

Petitioner treated for 15 months before stopping treatment in March 2020, at the start of the COVID-19 Pandemic. Br. at *9. Her treatment consisted of arthroscopic shoulder surgery, an MRI, two rounds of PT with a total of 38 sessions, pain medications and steroids, and adherence to a home exercise program. *Id.* She describes her condition in the first four months as moderate to severe, with pain levels ranging from six to eight. *Id.* at *11. Her MRI showed a partial thickness tear, fraying, tendinosis, and bursitis. *Id.* at *12.

Petitioner started PT four months after vaccination, but obtained no relief. Br. at *14. She therefore opted for surgery to improve her quality of life. *Id.* at *15. After surgery, however, her pain continued and at times worsened. *Id.* at *17. But by March 2020, her pain had abated to between zero and four out of ten. *Id.* At that point, she abruptly stopped treatment due to the COVID-19 Pandemic, but continued to do her home exercise program. *Id.*

Prior to her SIRVA, Petitioner was fully independent and lived an active lifestyle. Br. at *19. Since her injury, she cannot exercise the same way, no longer doing strength training or shoulder-intensive exercises like planks to avoid aggravating her shoulder.[4] *Id.* Although she was diabetic before her SIRVA, she was asymptomatic. *Id.* However, after her SIRVA, she became less active and began developing diabetes symptoms.[5] *Id.* She continues to experience residual stiffness in her shoulder. *Id.* Swimming helps with the stiffness, but Dr. Hammerman told her in February 2021 that swimming may be causing rotator cuff tendinitis from overuse and advised her to reduce her swimming. *Id.* at *19-20. Petitioner also developed right elbow pain due to adjusting the way she typed to compensate for her left shoulder pain. *Id.* at *20.

Petitioner seeks $123,000.00 in pain and suffering. Br. at *28. She relies on *Adams* and *Nute*, in which petitioners were awarded $123,000.00 and $125,000.00, respectively.[6] *Id.* Petitioner argues that her SIRVA is comparable, in that she and the *Adams* and *Nute* petitioners all underwent surgery, although those petitioners also

---

[4] Petitioner was advised to try cycling instead of swimming due to shoulder pain (Ex.18 at 17), but her medical records do not indicate that she has been advised not to do strength training or shoulder exercises in general.

[5] Petitioner did not provide medical records relating to diabetes diagnosis or treatment, or elaborate on what symptoms she experienced after her shoulder injury.

[6] *Adams v. Sec'y of Health & Human Servs.*, No. 20-703V, 2022 WL 963790 (Fed. Cl. Spec. Mstr. Feb. 24, 2022); *Nute v. Sec'y of Health & Human Servs.*, No. 18-140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019).

received cortisone injections. *Id.* at *24-26. Petitioner also compares her case to *Stokes*,[7] in which a petitioner was awarded $125,000.00. Br. at *26. Petitioner asserts that both she and the *Stokes* petitioner attended PT before and after surgery, underwent surgery, and did not have any cortisone injections. *Id.* at *26-27. Petitioner acknowledges that the *Stokes* petitioner's injury was slightly worse, but argues that Petitioner underwent a more severe surgery and endured pain for a longer duration, justifying a similar award. *Id.* at *27. Petitioner also cites four cases with pain and suffering awards of $110,000.00 – *Gray*, *Vaccaro*, *Guymon*, and *Wilt*[8] – arguing that her injury was more severe and of longer duration than these cases, justifying a higher award. *Id.* at *21.

Respondent proposes a lower pain and suffering award of $85,000.00. Respondent's Response to Petitioner's Brief in Support of Damages, filed Nov. 8, 2023, at *2 (ECF No. 46) ("Resp."). Respondent argues that Petitioner's SIRVA course was relatively mild compared to other surgical cases. Resp. at *8. Respondent emphasizes Petitioner's two-month delay in seeking care for her shoulder pain, noting that in ruling in Petitioner's favor on entitlement I stated that treatment gaps impact damages. *Id.* at *8-9 (citing my April 28, 2023 Entitlement Decision, ECF No. 39, at *10). When Petitioner did seek care, she initially had full ROM and only mild tenderness in the subacromial area. *Id.* at *9. With conservative treatment, including PT, Petitioner made improvements, although she continued to report pain. *Id.* After a brief treatment gap, Petitioner elected to pursue surgery. *Id.*

After surgery and post-operative PT, Petitioner exhibited a good recovery. Resp. at *9.[9] Although she had some cubital tunnel symptoms after wearing a post-operative sling while typing, these symptoms largely resolved within a month. *Id.* She continued PT

---

[7] *Stokes v. Sec'y of Health & Human Servs.*, No. 19-752V, 2021 WL 6550888 (Fed. Cl. Spec. Mstr. Dec. 17, 2021).

[8] Gray *v. Sec'y of Health & Human Servs.*, No. 20-1708V, 2022 WL 6957013 (Fed. Cl. Spec. Mstr. Sept. 12, 2022), *Vaccaro v. Sec'y of Health & Human Servs.*, No. 19-1883, 2022 WL 662550 (Fed. Cl. Spec. Mstr. Feb. 2, 2022), *Guymon v. Sec'y of Health & Human Servs.*, No. 19-1411V, 2022 WL 1447006 (Fed. Cl. Spec. Mstr. Mar. 25, 2022), and *Wilt v. Sec'y of Health & Human Servs.*, No. 18-446V, 2020 WL 1490747 (Fed. Cl. Spec. Mstr. Feb. 24, 2020).

[9] Respondent asserts that much of Petitioner's post-operative discomfort occurred after performing too many household chores against medical advice and increasing her strengthening program during PT. Resp. at *10 (citing Ex. 10 at 32, 36). There is only a single notation of Petitioner doing household chores against medical advice, when she reported sweeping using her nonoperative arm somewhat assisting with her left arm a month after her surgery. Ex. 10 at 36. The record does not support that this single instance caused much of her post-operative pain, and the strengthening she did during PT was part of her recovery program.

until March 2020, 15 months after vaccination. *Id.* At her final evaluation, Respondent asserts that she was "no longer wearing her sling and had no pain (0/10)."[10] *Id.*

Although Petitioner returned to her orthopedist in February 2021 reporting left shoulder pain, she has not shown that this was related to her SIRVA, and these symptoms were likely due to overuse from swimming. Resp. at *10. On examination, she exhibited good stability and ROM in her left shoulder, and any cubital tunnel syndrome complaints were confined to the right side. *Id.*

Respondent argues that *Adams* and *Stokes* are not good comparable decisions. Resp. at *10-12. The *Adams* petitioner sought care just eight days after vaccination and was already displaying ROM deficits – compared to Ms. Reynolds, who did not seek care for two months and at her first evaluation had full ROM. *Id.* at *11. Furthermore, that petitioner had a near full-thickness tear and large shoulder effusion, recovered only 75% of her previous functioning, treated for 23 months, and was unable to work for several months due to recovery – compared to Ms. Reynolds, who achieved a good recovery with surgery and PT, treated for 15 months with modest pain, and returned to work eight days after surgery. *Id.*

Respondent asserts that the *Stokes* petitioner had a far more severe SIRVA, prompting her to seek care only two weeks after vaccination. Resp. at *11-12. Thereafter, her pain was persistent and severe enough that she underwent surgery only a few months after vaccination. *Id.* at *12. In addition, the *Stokes* petitioner was undergoing cancer treatment during her SIRVA treatment and ultimately succumbed to cancer while her SIRVA claim was pending. *Id.* Respondent argues that the cases Petitioner cites with awards of $110,000.00 are closer comparisons than *Adams* and *Stokes*, but still involve more severe courses of SIRVA. *Id.* at *12-14.

Respondent instead cites favorably to *Hunt* and *Felland*, featuring pain and suffering awards of $95,000.00 and $100,000.00, respectively.[11] Resp. at *15. Although Petitioner attended more PT sessions than the *Hunt* petitioner, in Respondent's view this is balanced by the *Hunt* petitioner's three cortisone injections, contrasted with none for Petitioner. And the *Felland* petitioner attended less PT and treated for a shorter time, but underwent two steroid injections, making Petitioner's case less severe than *Felland* in Respondent's view. *Id.*

---

[10] At her final PT evaluation, Petitioner reported no *current* pain, but reported that at worst her pain was four out of ten. Ex. 24 at 16.

[11] *Hunt v. Sec'y of Health & Human Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022), and *Felland v. Sec'y of Health & Human Servs.*, No. 20-406V, 2022 WL 10724100 (Fed. Cl. Spec. Mstr. Sept. 6, 2022).

Petitioner disagrees with Respondent's contention that she had limited treatment and a prompt recovery after surgery. Petitioner's Reply Brief in Support of Damages, filed Nov. 29, 2023, at *1 (ECF No. 48) ("Reply"). Instead, Petitioner notes that she attended 26 post-operative PT sessions before the COVID-19 Pandemic brought her treatment to a halt – before she had fully recovered from her SIRVA. Reply at *1. But for the Pandemic, Petitioner asserts she would have attended PT twice weekly for at least another month, as recommended. *Id.*

Although Petitioner rated her then-current pain as zero at her final PT evaluation on March 2, 2020, she continued to have intermittent pain, decreased ROM and strength, and functional deficits. Reply at *1-2. Petitioner argues that her recovery was likely slowed because she could no longer attend in person PT and receive treatments like cupping from her therapist. *Id.* at *2.

Petitioner asserts that Respondent unfairly suggests that her returning to work eight days after shoulder surgery implies a greater degree of recovery than was the case. Reply at *3. Petitioner explains that she is an accountant who worked from home at the time of her surgery, which facilitated a prompt return to work – but did not mean she was cured. *Id.* If she had been a caregiver like the petitioner in *Adams*, or a substitute teacher like the petitioner in *Guymon* – jobs requiring physical presence and the use of one's shoulders – it is unlikely she would have been able to return to work eight days after surgery. *Id.*

Petitioner asserts that the *Hunt* petitioner had a mild to moderate SIRVA, and was largely pain free by four months after vaccination due to pain relief from cortisone injections – unlike Ms. Reynolds, who continued to report moderate (six out of ten) pain levels even two months after surgery. Reply at *3-4. And Petitioner disagrees that *Felland* is comparable, noting that the *Felland* petitioner reported no pain at discharge from PT and trained for Tough Mudder, an intense sporting event, three months thereafter, suggesting a full recovery – compared to Ms. Reynolds, who was still experiencing pain and reduced ROM when her PT abruptly stopped due to the COVID-19 Pandemic, and can no longer do strength training or shoulder exercises. *Id.* at *5-6.

Petitioner asserts that her case is most like *Adams*, with both undergoing similar surgeries and nearly identical amounts of post-operative PT. Reply at *6. Although the *Adams* petitioner treated for longer, Petitioner argues her treatment was cut short because of the Pandemic. *Id.* at *7.

### V. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section IV of *Amor v. Sec'y of Health & Human Servs.*, No. 20-978V, 2024 WL 1071877, at *7-10 (Fed. Cl. Spec. Mstr. Feb. 8, 2024).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[12]

### VI. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner suffered a moderate SIRVA that continued for at least 15 months (and likely for a bit longer), although she stopped treatment due to the COVID-19 Pandemic. Her pain levels fluctuated, and her injury ultimately resulted in surgery just under a year after vaccination. She treated with two rounds of PT totaling 38 sessions, as well as medications and a home exercise program.

I find the most comparable damage decision cases cited by the parties are *Wilt* and *Gray*. The petitioners in those cases also underwent surgery, did not have cortisone injections, and underwent PT, with the *Gray* petitioner attending a similar amount of PT as Petitioner, and the *Wilt* petitioner doing substantially less. *Gray*, 2022 WL 6957013, at *6; *Wilt*, 2020 WL 1490757, at *3-8 The *Wilt* and *Gray* petitioners also reported similar pain levels as Petitioner, and the *Wilt* petitioner had similar ROM restrictions. *Gray*, 2022 WL 6957013, at *6; *Wilt*, 2020 WL 1490757, at *3-8 The *Gray* petitioner, like Ms.

---

[12] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Reynolds, did not seek care until nearly two months after vaccination, while the *Wilt* petitioner sought care only five days after vaccination. *Gray*, 2022 WL 6957013, at *6; *Wilt*, 2020 WL 1490757, at *2. And the *Wilt* petitioner underwent surgery only four months after vaccination, suggesting a more severe injury. *Wilt*, 2020 WL 1490757, at *5. Significantly, however, Ms. Reynolds' injury persisted for 15 months, longer than *Wilt* (ten months) or *Gray* (eleven months).

Respondent's cases are not on point. *Felland* involves a milder injury of shorter duration. *Felland*, 2022 WL 10724100, at *6. And while the duration of the *Hunt* petitioner's injury was similar, the *Hunt* petitioner had lower pain levels and attended half the number of PT sessions. *Hunt*, 2022 WL 2826662, at *9. Significantly, after a cortisone injection two months after vaccination, the *Hunt* petitioner had minimal pain. *Id.* And Petitioner's other cases with higher awards (*Adams, Nute*, and *Stokes*) involve injuries that were more severe, of longer duration, and/or other extenuating circumstances not applicable in this case. Accordingly, taking all of the above into consideration (plus the fact that I commonly award a six-figure sum for surgery SIRVA cases), I find a pain and suffering amount somewhat lower than what Petitioner requests to be appropriate, and I shall award $110,000.00.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $110,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[13] **I also find that Petitioner is entitled to $2,647.14 in actual unreimbursable expenses** (as agreed by the parties).[14]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $112,647.14, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[14] Br. at 28; Resp. at 2 n.1.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[15]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.